# United States Court of Appeals
### For the Eighth Circuit

_____

No. 19-1541
_____

United States of America

*Plaintiff - Appellee*

v.

Devon Northon Golding, M.D.

*Defendant - Appellant*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: June 16, 2020
Filed: August 28, 2020

_____

Before LOKEN, ARNOLD, and GRASZ, Circuit Judges.

_____

GRASZ, Circuit Judge.

Devon Golding, M.D., was convicted of one count of conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371, and four counts of health care fraud in violation of 18 U.S.C. § 1347(a)(1). The district court[1] sentenced

---

[1]The Honorable Audrey G. Fleissig, United States District Judge for the Eastern District of Missouri.

Dr. Golding to six months of imprisonment and two years of supervised release. On appeal, Dr. Golding challenges the district court's denial of his motion for judgment of acquittal as to all counts. We affirm.

## I. Background

Dr. Golding operated a family medical practice in St. Louis, Missouri called National Medical, Inc. from 1996 to 2013. Beginning in 2009, he was also involved in a medical testing laboratory, Allegiance Medical Services, Ltd. ("Allegiance"), which operated out of the lower level of National Medical's building, which Dr. Golding owned. Between 2009 and 2012 Dr. Golding referred samples from his patients to be tested at Allegiance, where he served for a period of time as the medical director of the lab. During this time, Dr. Golding sporadically received checks from Allegiance totaling almost $30,000, allegedly for rent, utilities, medical equipment, and his salary for serving as the medical director. However, after the co-owner of Allegiance, Anthony Camillo, approached the government with information about the operations of the lab, it became clear that the payments Dr. Golding received were in fact offered in exchange for his continued referral of samples to the lab which would be submitted to Medicare or Medicaid for reimbursement.

Dr. Golding's connection to Allegiance was also part of a larger scheme involving several other defendants. In July of 2017, an indictment was issued charging Dr. Golding and three other defendants with one count of conspiracy[2] to violate the Anti-Kickback Statute and defraud a health care benefit program in

_____

[2]The indictment included three unlawful objectives: violation of the Anti-Kickback Statute under 42 U.S.C. § 1320a-7b(b)(1) and (2); defrauding a health care benefit program in violation of 18 U.S.C. § 1347(a); and making false statements in violation of 18 U.S.C. § 1001. However, the instructions given to the jury included only the first two unlawful objectives: violating the Anti-Kickback Statute and defrauding a health care benefit program.

violation of 18 U.S.C. § 371, and four counts of health care fraud in violation of 18 U.S.C. § 1347(a). The indictment also included twenty-six additional counts charging several of the other defendants with related crimes. A few months after the indictment, Dr. Golding filed a motion to sever his trial from the other defendants, claiming he may be prejudiced if a joint trial were held.

The district court agreed to sever the trial of Counts 1–6, involving Dr. Golding and others, from Counts 7–24 and 25–31, which did not involve Dr. Golding. In the following months, each of Dr. Golding's co-defendants pled guilty to some portion of Counts 1–6. But Dr. Golding proceeded to a five-day jury trial, resulting in a guilty verdict on all five counts.[3]

At the close of the government's case-in-chief and again at the close of the evidence, Dr. Golding moved for a judgment of acquittal, which the district court denied. The district court determined the government had made "a submissible case on each of the[] counts and presented sufficient evidence from which a jury could determine that the defendant is guilty beyond a reasonable doubt." On appeal, Dr. Golding's argument is that the government failed to prove he received any actual kickback as a part of the scheme, and therefore no reasonable jury could have convicted him on any count.

## II. Analysis

"We review *de novo* the denial of a motion for judgment of acquittal." *United States v. Cook*, 603 F.3d 434, 437 (8th Cir. 2010). "We apply the same standard of review to the district court's ruling on a motion for judgment of acquittal as we do to a sufficiency of the evidence challenge." *Id.* Accordingly, we must "view the

---

[3]Count 2 of the indictment was applicable only to Defendant Kazim A. Meo. Dr. Golding was charged with and convicted under Counts 1, 3, 4, 5, and 6.

evidence in the light most favorable to the government, resolving evidentiary conflicts in favor of the government, and accepting all reasonable inferences drawn from the evidence that support the jury's verdict." *Id.* We will uphold the conviction "unless no reasonable jury could find the defendant guilty." *United States v. Mendoza-Larios*, 416 F.3d 872, 873 (8th Cir. 2005).

## A. Conspiracy Against the United States

To convict a defendant of conspiring to commit an offense against the United States under 18 U.S.C. § 371, the government must prove beyond a reasonable doubt "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Mauskar*, 557 F.3d 219, 229 (5th Cir. 2009) (quoting *United States v. Williams*, 507 F.3d 905, 910 n.4 (5th Cir. 2007)). The "unlawful objective[s]" at issue here are violating the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and defrauding a health care benefit program, 18 U.S.C. § 1347(a).

On appeal, Dr. Golding's only argument is that, even taken in the light most favorable to the jury verdict, "no actual kickbacks can be proven by the Government given the evidence in this case." Instead, Dr. Golding claims all of the payments he received from Allegiance were "for a legitimate purpose." But Count 1 did not charge Dr. Golding with substantively violating the Anti-Kickback Statute or committing health care fraud, rather it charged him with *conspiring* to commit said crimes under 18 U.S.C. § 371. Because a conviction under § 371 does not require the successful completion of the "unlawful objective[s]," here either receiving illegal kickbacks or defrauding a health care benefit program, Dr. Golding's sole argument on appeal, that he did not receive a kickback, is unavailing. *See Iannelli v. United States*, 420 U.S. 770, 777–78 (1975) ("Conspiracy is an inchoate offense, the essence

of which is an agreement to commit an unlawful act. . . . [A] conspiracy poses distinct dangers quite apart from those of the substantive offense."). And at no point does Dr. Golding argue that either the existence of the conspiracy itself or his involvement in it was insufficiently proven. But even if he had, there was abundant evidence that he actively participated in the conspiracy and knew it was wrong.

The government presented evidence establishing Dr. Golding entered an agreement with Camillo, the part-owner and manager of Allegiance, and eventually others, to create a medical testing lab that made money through illegal kickbacks. Camillo had approached the government with information regarding Dr. Golding and testified extensively at trial after entering a proffer arrangement and cooperation agreement. During the trial testimony, Camillo explained how in 2009 he and Dr. Golding agreed to open Allegiance in the basement of the building Dr. Golding owned. Camillo and Dr. Golding created a business plan by which Dr. Golding could be "involved" in three different ways with the lab while maintaining its independence to test samples from other medical providers. One plan provision involved Dr. Golding's attorney serving as part-owner rather than Dr. Golding himself — although Camillo "knew that his attorney would probably be sharing those benefits with [Dr. Golding]." The second two sources of involvement for Dr. Golding would be payment of a medical director fee ($1,000 per month) and rent for the space ($2,000 per month). In exchange, Allegiance would receive Dr. Golding's "goodwill," that is, Dr. Golding agreed to send his patients to Allegiance for their services. This "goodwill" or referral of specimens was a condition of the partnership.

The government offered into evidence photocopies of the 22 checks Dr. Golding received from Allegiance from 2009 to 2012. Several of these checks were signed by Camillo with a memo line indicating they were payment for Dr. Golding's medical director duties. Camillo testified that Dr. Golding ceased performing any of his director duties around the time the first of these checks was made out — but the payments continued. According to Camillo, these payments were made "for [Dr.

Golding's] goodwill and [his] sending patients to the laboratory." Camillo also explicitly testified he was aware, as early as November of 2009, that federal law prohibited "a provider such as Dr. Golding" from being able to "solicit or receive payment in return for referring his business to a Medicare facility or service." Nonetheless, Camillo testified that claims from Allegiance were submitted to both Medicare and Medicaid by Allegiance. Camillo testified Dr. Golding was paid $20 for every specimen sent to Allegiance, including referrals for which Allegiance "actually received reimbursement" from Medicare or Medicaid.

In light of this evidence, we will not disturb the jury's determination that Dr. Golding was guilty of the conspiracy charge.

## B. Health Care Fraud

We next consider Dr. Golding's argument that his convictions for committing health care fraud should be reversed. Dr. Golding argues once again the government failed to prove he actually received kickback payments. This argument misses the mark because his conviction for health care fraud did not depend on his receipt of kickbacks, but instead on the kickbacks Allegiance paid to other co-conspirators. And once again, Dr. Golding does not argue there is insufficient evidence to prove those transactions occurred.

To convict a defendant of health care fraud under 18 U.S.C. § 1347(a), the government must prove beyond a reasonable doubt (1) the defendant knowingly executed a scheme to defraud Medicare or Medicaid, (2) with the intent to defraud, (3) in connection with payment for health care benefits or services, and (4) the Medicare Program and Medicaid Program are public health care plans, affecting commerce, under which health care benefits or services were provided to individuals. 18 U.S.C. § 1347(a). And even if Dr. Golding's conduct did not itself satisfy each of

these four elements, his appeal fails due to the rule regarding co-conspirator liability. *See Pinkerton v. United States*, 328 U.S. 640, 647 (1946).

Under the *Pinkerton* doctrine, "each member of a conspiracy may be held criminally liable for any substantive crime committed by a co-conspirator in the course and in furtherance of the conspiracy, even though those members did not participate or agree to the specific criminal act." *United States v. Jenkins-Watts*, 574 F.3d 950, 959 (8th Cir. 2009) (quoting *United States v. Hayes*, 391 F.3d 958, 962 (8th Cir. 2004)). Because the jury found Dr. Golding to be a member of the conspiracy involving Allegiance and the services of that lab, he may be held "criminally liable" for the actions his co-conspirators took in furtherance of the medical testing conspiracy. Therefore, Dr. Golding can be held liable for substantive violations of § 1347(a) based on the actions of his co-conspirators, including Camillo.

The evidence presented at trial establishes that Camillo, the part-owner and manager of Allegiance, committed substantive offenses of health care fraud by knowingly submitting or causing to be submitted reimbursement claims to Medicare for services provided by Allegiance, which were tied to illegal kickbacks. These submissions occurred in August and September 2012, when Dr. Golding was part of the conspiracy. Therefore, the jury was reasonable in finding substantive violations of § 1347(a) committed by members of the conspiracy. And, as a co-conspirator, Dr. Golding was properly held liable for these substantive crimes committed by Camillo in furtherance of the scheme. *See Pinkerton*, 328 U.S. at 647.

### III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

_____